430 So.2d 711 (1983)
James M. FOWLER, et al., Plaintiffs-Appellees,
v.
Charlie W. JORDAN, et al., Defendants-Appellants.
No. 15266-CA.
Court of Appeal of Louisiana, Second Circuit.
March 28, 1983.
*712 Fish, Montgomery & Robinson by Roy M. Fish, Springhill, for plaintiffs-appellants.
Charles M. Brandt, Lafayette, for defendants-appellees.
Before HALL, FRED W. JONES, Jr. and SEXTON, JJ.
SEXTON, Judge.
Plaintiff-appellee brought suit against defendant-appellant for attorney's fees allegedly due for services rendered by the plaintiff to the defendant. This case was tried before a jury, and the jury rendered a verdict in plaintiff's favor in the amount of $54,800. Defendant appealed to challenge the judgment rendered in accordance with the jury's verdict. We amend, and as amended, affirm.
Plaintiff-appellee in this cause is attorney James Monroe Fowler, a sole practitioner whose office is located in Jonesboro, Louisiana. Defendant-appellant is Charlie Jordan, owner and president of Ana-Log Well Logging Company. Mr. Jordan lives in Tyler, Texas, and owns land in Bienville Parish, Louisiana.
Mr. Fowler first worked for Mr. Jordan in August 1978. At that time, Mr. Fowler successfully represented Charlie Jordan and his brothers Ralph and James in obtaining their share of the life insurance proceeds that were paid to their step-father upon the death of their mother. Mr. Fowler collected his fees out of the settlement without incident.
Subsequent to Mr. Fowler's work in procuring the brothers' share of the insurance proceeds, the Jordans became aware of potential expropriation proceedings affecting land and subsurface rights jointly owned by them in Bienville Parish. The Jordans had received reports early in 1979 that Southern Natural Gas Company (Southern Natural) was "at that time sending landmen throughout [the Bear Creek Field of Bienville Parish] to make their initial contact and try to buy the land from those owners in Bear Creek [Field] as cheaply as they could." Southern Natural had purchased sub-surface storage rights from many landowners in the area for as little as $40 an acre, and was planning to initiate expropriation proceedings to obtain the sub-surface rights of recalcitrant landowners in order to construct a massive subterranean storage depot. The Jordans were particularly concerned about the upcoming expropriation proceeding since they owned land and mineral rights in the Bear Creek Field, and Charlie Jordan firmly believed that there were unproduced oil deposits beneath their land which they would lose if their sub-surface rights were expropriated.
*713 In assessing Southern Natural's attempts to purchase sub-surface storage rights, Mr. Fowler and the Jordans discovered several other issues related to the Jordans' interests in the Bear Creek Field. One issue concerned the mineral rights owned by the Jordans in a tract of land they inherited from their father. The Jordans' father initially owned only one-half of the mineral rights in the tract at issue and had subsequently, in two separate conveyances, sold one-fourth of the tract's mineral rights on each occasion, apparently leaving him with no mineral interests in the tract. However, Mr. Fowler reasoned that on these two occasions the Jordans' father had not sold a fourth of the totality of the mineral rights in the tract, but had merely sold a fourth of the mineral rights still retained by him. The Jordans' father had not sold a fourth of the tract's total mineral rights in these two conveyances, Mr. Fowler surmised, but had sold only a fourth of the fractional interest still owned by him at the time of each sale. Mr. Fowler reasoned, on the basis of this premise, that the Jordans' father still owned mineral rights in the tract at the time of his death, and that these interests had been inherited by Charlie Jordan and his brothers. He concluded that Southern Naturalas lessee of these mineral rights owed the Jordans thousands of dollars in unpaid royalties for the mineral interests for which the Jordans had not been credited.
In addition to the potential claim for unpaid mineral interests, Mr. Fowler determined, after examining geologic data and records of the Commissioner of Conservation's proceedings, that the Jordans also had a claim against their mineral lessee, Southern Natural, for draining hydrocarbon deposits underlying the Jordans' land. Mr. Fowler concluded, from his research, that Southern Natural had drained the Jordans' property on a massive scale for several decades through wells on outlying tracts.
The Jordans were pleased with Mr. Fowler's efforts in obtaining the insurance settlement which issued upon the death of their mother, and decided to retain him to protect their interests with respect to the upcoming expropriation proceedings, the drainage claim, and the claim for the Jordans' uncompensated mineral interests. The Jordans retained Mr. Fowler, under three separate employment contracts, to pursue the three related mineral claims.
The first contract, entered into by James Fowler and Charlie Jordan on March 11, 1979, stipulated that James Fowler prosecute the drainage claim. This contract originally provided that Mr. Fowler would be reimbursed for his costs and expenses, and paid at the rate of $50 an hour. However, a written addendum signed by both parties provided that the contract would be void if Mr. Fowler "extracted a settlement from Southern Natural", it being orally agreed between the parties that in case of a settlement Mr. Fowler would be paid a 25% contingency fee.
The second employment contract was also confected on March 11, 1979, but unlike the first was signed by James Fowler and all of the Jordan brothersCharlie, James and Ralph. This second contract obligated Mr. Fowler to prosecute the claim for the uncompensated mineral interests for a 25% contingency interest in whatever amount might be recovered on this claim.
Several months after the first two contracts were perfected, Charlie Jordan and James Fowler perfected an oral contract under which Mr. Fowler agreed to represent the Jordans in the upcoming expropriation suit which the parties expected would be filed by Southern Natural. The parties agreed that Mr. Fowler would be paid 25% of any amount he obtained in excess of the offer that Southern Natural made before filing the expropriation suit.
On April 24, 1979, James Fowler filed the drainage suit against Southern Natural on behalf of the Jordans; the suit prayed for nearly $1,500,000 in damages. On May 8, 1979, Fowler filed suit for the uncompensated mineral interest on behalf of the Jordans, suing Southern Natural for nearly six million dollars in damages, penalties and attorney's fees. Some six months later, in the fall of 1979, Southern Natural filed suit *714 against the Jordans in order to expropriate the Jordans' sub-surface rights in the Bear Creek Field.
Subsequent to the filing of the Southern's expropriation suit, Fowler entered negotiations with Southern Natural with respect to all three suits pending between the partiesthe drainage and mineral acreage suits filed by the Jordans against Southern Natural, and the expropriation suit filed by Southern Natural against the Jordans. Fowler presented the initial offer to Southern Natural, with Charlie Jordan's approval, proposing on January 11, 1980, that the Jordans compromise their claim against Southern Natural, that the Jordans be given $275,000 for the drainage claim, $75,000 for the mineral acreage dispute, that Southern Natural grant the Jordans a rescission of the mineral lease that Southern Natural held on Jordans' land and that the Jordans receive approximately $550 an acre for the expropriation of their sub-surface rights.
Three days later, on January 14, Southern Natural presented a counteroffer, proposing that the Jordans be paid $150,000 for their two claims, $125,000 for the expropriation rights, and that Southern Natural partially rescind the mineral lease on the Jordans' land, releasing a single vertical zone consisting of a three finger lime interval. Southern Natural's counteroffer contemplated that the Jordans compromise their two suits in return for these substantial considerations. Southern Natural's counteroffer also stipulated that the Jordans refrain from filing the compromise in the public records, that the Jordans refrain from communicating to fellow landowners the content of the compromise agreement, and that the Jordans would be liable in damages for the breach of this contractual gag stipulation.
Fowler and Albert Loomis, an attorney who had been associated to assist James Fowler in prosecuting the Jordans' claims, had several meetings with Charlie Jordan in which they vehemently urged that Charlie Jordan accept Southern Natural's offer. They were aware of legal weaknesses in the Jordans' claims, that timing was critical in the negotiations with Southern Natural, and that Southern had extended the offer primarily to avoid delays in their plan to expropriate subterranean zones for a massive storage depot. However, Charlie Jordan opposed accepting the offer because the contractual gag threatened him with liability, and prevented him from sharing his knowledge with fellow landowners contrary to his natural sympathies.
Jordan testified that Fowler and Loomis yelled and cursed at him for wanting to reject the offer. Fowler sent Jordan a letter stating that he was not willing to risk his share of the settlement offer in litigation. Fowler insisted that a new employment contract and "fee arrangement" be perfected before the claims proceed to trial. Charlie Jordan then dismissed Mr. Fowler on February 5, 1980, stating that Fowler had lost faith in the case and would be ineffectual at trial. The parties agreed that Mr. Fowler would prepare a bill for services rendered up to that date, and sent it to Charlie Jordan. However, Charlie Jordan thereafter bluntly refused to pay Fowler for his fees and expenses. Subsequent to this refusal, on February 27, Mr. Fowler filed suit against Charlie Jordan in the Second District Court of Bienville Parish. Mr. Fowler sought compensation for the work he had done, pursuant to the three employment contracts, on the three suits pending between Southern Natural and the Jordans.
In the suit originally bought by Mr. Fowler, Albert Loomis was a party plaintiff. However, Charlie Jordan vigorously denied that he had ever authorized the association of Mr. Loomis. Mr. Loomis withdrew from the suit and his hours were deleted from the claim. The suit was originally brought against all three of the Jordan brothers, moreover, but by stipulation of the parties, all defendants were dismissed save Charlie Jordan who at all times had acted as the Jordans' spokesman.
Mr. Fowler alleged in his petition that he had rendered 1090 hours worth of legal services for the Jordans under the three employment contracts pursuant to which he *715 had labored on the three mineral rights suits pending between Southern Natural and the Jordans. At trial, Mr. Fowler presented slightly conflicting claims. At one time he stated that he had spent 1129.7 hours on behalf of the Jordans with respect to the unresolved mineral disputes. At another time he presented sub-totals of his time expenditures which added up to 1096 hours. Mr. Fowler asked that he be compensated for his time at the rate of $50 an hour. Mr. Fowler furthermore prayed, in his petition, for approximately $1,000 worth of expenses.
At the close of four days of testimony on the extent and adeptness of Mr. Fowler's efforts on behalf of Charlie Jordan, the jury rendered a verdict to Mr. Fowler's favor, finding that he was entitled to $53,200 in attorney's fees, and $1,600 in expenses.
The Louisiana jurisprudence has clearly stated the rules governing the compensation of attorneys who have been discharged by their clients. An employment contract between an attorney and his client is a mandate, and a client may revoke that mandate and discharge his attorney at will, such revocation terminating and dissolving the contract. Krebs v. Bailey's Equipment Rental, Inc., 328 So.2d 775 (La.App. 1st Cir.1976); Wright v. Fontana, 290 So.2d 449 (La.App. 2d Cir.1974); Schiro v. Perkins, 240 So.2d 920 (La.App. 4th Cir.1970). Unless discharged for cause, an attorney who has been dismissed by his client is entitled to be reimbursed for his services on a quantum meruit basisregardless of whether the attorney was initially retained under a contingency, set fee, or hourly retainer. Chiasson v. Law Firm of Dragon & Kellner, 335 So.2d 87 (La.App. 3d Cir.1976); Krebs, supra; Guilbeau v. Fireman's Fund Insurance Co., 293 So.2d 216 (La.App. 3d Cir. 1974); Wright, supra; Kramer v. Graham, 272 So.2d 716 (La.App. 3d Cir.1973); Schiro, supra.
The determination of an attorney's legal compensation under a quantum meruit analysis is predicated upon an evaluation of the facts in the record and an application of the criteria listed in Disciplinary Rule 2-106(B) of the Code of Professional Responsibility. Pharis & Pharis v. Rayner, 397 So.2d 1295 (La.1981), on remand 406 So.2d 723 (La.App. 3d Cir.1981); Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979). The most important of these guidelines focus upon: the time and labor required in prosecuting or defending the claim; the difficulty and novelty of the questions involved; the degree to which the case precluded other employment; the fees customarily charged in the locality for similar services; the amount of money involved and the results obtained; the time constraints operative; and the experience, reputation and ability of the lawyer.[1] A quantum meruit analysis properly evaluates not merely the hours expended, but the results and benefits obtained. Smith v. Westside Transit Lines, Inc., 313 So.2d 371 (La.App. 4th Cir.1975). A quantum meruit analysis is sensitive, moreover, to the quality of a lawyer's research and work product. Simon v. Metoyer, 383 So.2d 1321 (La.App. 3d Cir. 1980), writ den. 389 So.2d 1338 (La.1980).
However, the attorney who has been discharged and is seeking to recover on a quantum meruit basis assumes the burden of proving the value of his services, *716 and the extent of his expenses. Simon v. Metoyer, supra; Chiasson v. Law Firm of Dragon & Kellner, supra; Smith v. Westside Transit, supra; Kramer v. Graham, supra. Recovery is limited to the actual value of the service rendered. Chiasson, supra; Saucier v. Hayes Dairy Products, supra. Thus, the discharged attorney may not collect an excessive stipend and has no right to fees not actually earned. Simon v. Metoyer, supra; Saucier v. Hayes Dairy Products, supra. It is expressly within the province of the appellate courts of this state, moreover, to scrutinize and regulate attorney-client relations, and prevent the imposition of unjust fees. La. Const. Art. 5, § 5(B) (1974); Singer Hutner Levine Seeman & Stuart v. La. State Bar Ass'n, 378 So.2d 423 (La.1979); Saucier v. Hayes Dairy Products, supra.
Several evidentiary aspects of this case favor a finding that James Fowler was entitled to the $54,800 verdict rendered in his favor by the jury. Kerry Massari, one of the attorneys that represented Southern Natural and opposed Mr. Fowler, stated that Mr. Fowler performed in a competent and professional manner at all times in representing Charlie Jordan. Mr. Fowler's legal responsibilities were demanding and onerous because Southern Natural was legally represented by a large and prominent oil and gas firm which sometimes dedicated as many as five attorneys to the Jordan litigation. Mr. Fowler's duties on behalf of his client involved extensive legal and geologic research, exhaustive title searches, the deposing of several witnesses, constant correspondence with Charlie Jordan, and close consultations with experts. Mr. Fowler filed and responded to voluminous pleadings and drafted nearly one hundred and fifty interrogatories in the case. The Jordans' claims were factually and geologically complex. Mr. Fowler's secretary testified that she spent most of her time working on the Jordan case, and another averred that Mr. Fowler had to turn away several clients because of the time demands imposed by the Jordan case. There can be little doubt, from the record, that Mr. Fowler invested hundreds of hours in the case. Also, his hourly rate of $50 was relatively low for his locale.
Mr. Fowler realized that timing was critical in the negotiations and that Southern Natural wished to swiftly eliminate all legal barriers to its expropriation in order to expedite the construction of its underground storage facility. It is to Mr. Fowler's credit that he exploited this time factor to his client's advantage in order to extract a favorable settlement offer from Southern Natural. A comparison of the settlement offer extended to Charlie Jordan while represented by James Fowler and the amount ultimately obtained by Charlie Jordan absent Fowler's counsel provides a telling indication of Fowler's usefulness. Fowler obtained an offer of $275,000 and the rescission of a mineral lease as to a lucrative production zone owned by the Jordans; subsequent to Fowler's discharge, the Jordans ultimately received approximately $48,000 in the expropriation suit and nothing in the other two lawsuits. Thus, Mr. Fowler's representation could be said, after the deduction of Mr. Fowler's legal fees, to have been worth $175,000 to the Jordans.
While Mr. Fowler prosecuted the Jordans' claims with commendable zeal, there are several countervailing considerations which must be evaluated in assessing Mr. Fowler's performance. In pursuing the mineral rights and drainage claims, Mr. Fowler did not directly address the precise legal and geological issue which Charlie Jordan had indicated all along was his primary concern; Charlie Jordan believed, pursuant to his own geologic analysis, that there were recoverable oil deposits in a subterranean zone beneath the Jordans' land that would be lost to them if Southern Natural should succeed in expropriating the Jordans' subsurface rights.
Charlie Jordan's counsel in this case, urged, moreover, that Mr. Fowler's performance was flawed by fundamental misconceptions and procedural error. The drainage suit, on which Mr. Fowler spend hundreds of hours, was for drainage which occurred, for the most part, prior to 1968. A contract of lease existed between the *717 Jordans and Southern Natural and contractually bound Southern Natural, as lessee, to protect the Jordans' interests in good faith. The drainage suit, which alleged a breach of this contractual obligation, was therefore an action in contract and subject to the 10 year prescriptive period governing suits on contracts and other "personal actions." LSA-C.C. Art. 3544. The drainage suit had thus prescribed before Mr. Fowler was retained by Charlie Jordan. With respect to a separate instance of drainage which had not prescribed, Mr. Fowler failed to put Southern Natural in default as is required by the Mineral Code. LSA-R.S. 31:136. The "mineral acreage" suit, in which Mr. Fowler also invested hundreds of hours, was based upon the fundamentally flawed legal supposition that when the Jordans' predecessor in title sold ¼ of the mineral interests in a certain tract on different occasions, he was not conveying ¼ of the tract's total mineral rights, but merely ¼ of the mineral rights which he still retained and owned in the tract.
Kerry Massari, Southern Natural's lead attorney in the Jordan litigation, testified that the two suits filed by Mr. Fowler on behalf of the Jordans were "insignificant, unjust, frivolous," and then he advised Southern Natural "that they not settle for a penny." A portion of the drainage claim was ultimately dismissed on the grounds of prescription, and the remainder of the drainage claim which dealt with a more recent instance of alleged drainage was dismissed because of Mr. Fowler's failure to put Southern Natural in default as is expressly required by the Mineral Code. The mineral acreage suit involving the interpretation of the mineral right conveyances made by the Jordans' predecessor in title was dismissed for a failure to state a cause of action.
Mr. Jordan's counsel contended, at trial, that Mr. Fowler's recovery should be reduced because Fowler had spent hundreds of hours on one claim that had prescribed, and hundreds more on a claim that was based on a fundamentally flawed deed interpretation. While this argument is persuasive, it is not however entirely dispositive since the flaws in the Jordans' claims constitute a double-edged sword in evaluating Mr. Fowler's performance. While his expenditure of time on these cases generated unnecessary legal expense from Charlie Jordan's viewpoint, it redounds to Mr. Fowler's credit that his astute timing enabled him to receive a very substantial offer of $150,000 for these allegedly "frivolous" claims.
Discrepancies in the evidence as to the time spent by Mr. Fowler on behalf of the Jordans constitute a crucial concern in applying a quantum meruit analysis to Mr. Fowler's efforts. Mr. Fowler began working on the Jordans' mineral claims on approximately February 22, 1979, and was discharged on February 5, 1980. Thus, Mr. Fowler spent approximately 50 weeks in prosecuting these mineral claims on behalf of the Jordans. Mr. Fowler asserted that he expended 1100 hours in prosecuting these claims, which assertion, if true, would necessarily imply that Mr. Fowler devoted an average of 22 hours per week (4.4 hours a day in a 5-day week) exclusively to the Jordans' claims. Mr. Fowler's claim for 1100 hours tends to imply that he spent upwards of one-half of his total billable hoursfor a 50 week periodworking exclusively on the Jordans' claims.
The premise that from February 22, 1979, to February 5, 1980, Mr. Fowler dedicated half of his total billable hours to the Jordans' claims, is belied by the work calendar kept by Mr. Fowler. Mr. Fowler's calendar indicates that during the time period involved, he represented over 80 clients. While his calendar indicates that he may have spent more time on the Jordans' file than on any other single claim, it does not establish that the majority of his time was spent on the Jordans' claims.
The assertion that Mr. Fowler spent 1100 hours on behalf of the Jordans is also undermined by the time slips kept by Mr. Fowler. It should be noted that Mr. Fowler stated that he did not religiously record every unit of time spent on the Jordans' cases, since he did not expect to be compensated *718 on an hourly basis. Nevertheless, Mr. Fowler's recordsalbeit incompletereflect a total of only 640 hours spent on the Jordans' claims.
The record exhibits notable inconsistencies in Mr. Fowler's billing practice. Mr. Fowler billed the Jordans for a minimum of one hour for every letter composed by him on their behalf although many of the letters thus billed were admittedly written in ten to fifteen minutes. Mr. Fowler also billed one hour each time he sent a copy of a letter to an additional party. Mr. Fowler billed 36 hours for depositions taken over the course of a two day period in Dallas when according to Mr. Fowler's own testimony his travel and labor time could not have exceeded 30 hours.
In this case Mr. Fowler obtained a favorable settlement offer, the acceptance of which would have triggered a significant contingency fee. This offer resulted in his discharge without cause. He is therefore entitled under a quantum meruit analysis to a fee commensurate with the diligence, skill, time and effort he has invested in the case and the results he has obtainednotwithstanding the fact that his client chose to reject the offer thus obtained. Quantum meruit analysis cannot be reduced to the mere application of mathematical formulas; it involves, instead, a complex calculus of the many factors delineated above, and is sensitive to the unique facts of each case.
On balance, although his hourly claims are not wholly substantiated, Mr. Fowler prosecuted Charlie Jordan's claims with a tenacious diligence and spent a great deal of time in the endeavor. However, we note that the burden of proof is on an attorney to establish the extent and value of his services. We moreover conclude, as a factual matter, that James Fowler did not provewith the requisite specificitythat he worked 1100 hours on the Jordans' claims. In light of this finding, and the detailed considerations delineated above, we reduce Mr. Fowler's award and adjudge him to be entitled to $43,500 in fees and expenses.
For the foregoing reasons, we decree defendant-appellant Charlie Jordan to be indebted to plaintiff-appellee James Fowler in the amount of $43,500. We accordingly amend, and as amended, affirm the judgment rendered in the lower court. The costs of this appeal are to be borne equally by appellant and appellee.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Disciplinary Rule 2-106(B) provides in part that:

"Factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent."