683 So.2d 697 (1996)
Intervention in Shannon O'ROURKE, wife of/and George O'Rourke
v.
Mark CAIRNS, D.D.S.
No. 95-C-3054.
Supreme Court of Louisiana.
November 25, 1996.
Rehearing Denied December 13, 1996.
*698 Stephen Barnett Murray, New Orleans, for Applicant.
Don Carsten Gardner, Harahan, Michael Alexander Fenasci, New Orleans, for Respondent.
KIMBALL, Justice.[*]
We granted certiorari to determine the standard by which attorney fees are to be apportioned among discharged and subsequent counsel when the client dismissed counsel for cause in a contingency fee case which was successfully prosecuted to judgment. The district court conducted a hearing to determine the proper allocation of fees, and held that dismissed counsel had been discharged for cause. From a stipulated amount of fees at stake, the court awarded discharged counsel a sum based on an hourly rate, the remaining portion granted to subsequent counsel. The court of appeal affirmed the judgment in all respects.

FACTS
The instant dispute arises from a medical malpractice action between Shannon and George O'Rourke against Mark Cairns, D.D.S. Succinctly, the O'Rourkes claimed Dr. Cairns negligently performed dental treatment on George O'Rourke, which included substandard root canal work and excessive prescription of pain medication causing addiction. In pursuit of this claim, the O'Rourkes hired Roland Belsome, an attorney then practicing with the New Orleans law firm of Wiedemann & Fransen. The written contingency fee contract between the O'Rourkes and Belsome, dated February 17, 1986, provided for a fee of thirty-three and one-third percent of whatever sums were *699 recovered without the necessity of filing a lawsuit, and forty percent if filing was necessary. For the next several months, Belsome conducted expansive discovery which included requests for admissions, depositions, interrogatories, and document production. Thereafter, Belsome prepared a medical review panel submission, which panel found that Dr. Cairns failed to comply with the appropriate standard of care in Mr. O'Rourke's case.[1] Following this favorable ruling, Belsome filed suit in the Twenty-Fourth Judicial District Court on February 3, 1989.
In March 1991, Dr. Cairns filed for bankruptcy. Following this, Belsome moved for relief from the automatic bankruptcy stay. On April 29, 1991 the stay was lifted, allowing the medical malpractice suit to proceed in state court.[2] Shortly after the stay was lifted, Dr. Cairns' insurer removed the case to federal court, relying on federal bankruptcy jurisdiction. The case was subsequently remanded to state court;[3] however, these delays necessitated the second of two trial date continuances in the O'Rourke lawsuit. On July 15, 1991, Belsome moved to set the O'Rourke matter for trial for the third time. Ten days later, George O'Rourke discharged Belsome as his attorney in the case.
After dismissing Belsome, George O'Rourke entered into a written contingency fee arrangement with attorney Michael Fenasci. The contract between George O'Rourke and Fenasci reflected identical fee percentages as the Belsome contract. With O'Rourke's approval, Fenasci engaged Don Gardner as co-counsel in the matter.[4] Fenasci and Gardner pursued the case through pre-trial motions, bench trial, a positive judgment for the client, and post-judgment settlement with Dr. Cairns and the Louisiana Patient's Compensation Fund. Fenasci and Gardner secured judgment exceeding one million dollars, which, pursuant to the statutory cap on medical malpractice damages, the district court reduced to $500,000. Subsequent negotiations produced a settlement of $65,000 from Dr. Cairns and $500,000 from the Compensation Fund.
Following his dismissal, Belsome intervened in the O'Rourkes' suit seeking recovery of fees and costs owed him under the contingency fee contract of February 1986.[5] At trial on the intervention, the district court received testimony and evidence to determine the proper allocation of fees between Belsome and subsequent counsel. The parties stipulated the fees in dispute amounted to $206,000.[6] The trial judge, who presided over the case from its inception, accepted this stipulation as a reasonable fee under Louisiana law.[7] The court then began to analyze what fee, if any, Belsome was due for his work in the case. In Reasons for Judgment, the court observed several instances in which Belsome and George O'Rourke's testimony conflicted. The court found O'Rourke to be a particularly credible witness in testifying to reasons for Belsome's dismissal. These reasons included communication problems, misrepresentations, and Belsome's confessed lack of experience and practice in the medical malpractice area. Among other things, these actions contributed to a general lack of confidence by George O'Rourke in his attorney.
*700 In contrast, the court found Belsome's testimony lacked credibility. Notably, the trial judge found Belsome inflated time records, which were reconstructed for the intervention trial,[8] and overstated the nature of work that the court characterized as superfluous and representative of a learning experience. The trial court referred to key aspects of Belsome's representationthe medical review panel submission and lifting the bankruptcy stayas noteworthy examples of Belsome's exaggeration. In both, the court found the effort and time involved to be overstated. These findings, together with the client's testimony regarding reasons for dismissal, led the court to find Belsome's discharge to be for just cause. Moreover, the court found the discharge effected before the fee was earned led to revocation of the attorney's mandate and dissolution of the fee contract. Relying on this court's pronouncement in Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979), the trial judge relegated Belsome to a quantum meruit recovery. Applying the Saucier factors, the court awarded Belsome $25,000 in attorney fees, computing the remuneration on an hourly basis only. The court made a finding that Belsome spent approximately two hundred hours in the matter, and multiplied that number by an hourly rate of $125 per hour. Consequently, the court awarded Fenasci and Gardner the remaining $181,000 as their fee in equal proportions.
The Court of Appeal, Fifth Circuit affirmed the district court's judgment in all respects. O'Rourke v. Cairns, 95-381 (La. App. 5th Cir. 11/28/95), 666 So.2d 345. We granted Belsome's application for certiorari, O'Rourke v. Cairns, 95-3054 (La.3/14/96), 668 So.2d 1149, because the case presented a significant unresolved issue of law for which this court should provide guidance to lower courts and litigants. La.Sup.Ct.R. X, § 1(a)(2).

LAW
Under its inherent judicial power and its original jurisdiction, the Supreme Court of Louisiana has exclusive authority to regulate the practice of law in this state. La. Const. art. V, § 5(B); Mire v. City of Lake Charles, 540 So.2d 950 (La.1989). This broad grant of regulatory power includes the responsibility to exert control by adjudicatory means of individual cases as they arise, including those relative to discharge of counsel and regulation of fees, whether by contingency contract or otherwise. Saucier, 373 So.2d at 118.
The instant case requires this court to review the reasonableness and apportionment of attorney fees arising from two contingency fee contracts. Louisiana courts have long approved of the contingent fee contract to compensate attorneys. Hope v. Madison, 194 La. 337, 193 So. 666, 670 (1940); Andirac v. Richardson, 125 La. 883, 51 So. 1024 (1910). Indeed, ninety years ago Justice Provosty distinguished the contingency fee contract from the acquisition of a litigious right, and emphasized:
So far as its validity is concerned we see no reason why attorneys should not be permitted to stipulate that they shall have by way of fees a certain proportion of whatever they may recover.
Succession of Landry, 116 La. 970, 971, 41 So. 226, 227 (1906).[9] Aside from its validity vel non, the social utility of a reasonable contingency fee arrangement promotes access to needed legal services for those without means to afford the risk of financial loss. Saucier, 373 So.2d at 105 (original hearing).[10] *701 Therefore, contingency fee contracts, like all other attorney fee contracts, are subject to review and control by the courtsmost notably for reasonableness. Model Rules of Professional Conduct Rule 1.5(a); Husk v. Blancand, 155 La. 816, 99 So. 610, 612 (1924). That leads us to the issue of discharge of counsel retained under a contingency fee arrangement and the issue of dismissal with or without just cause.

I.

The Pre-Saucier Method
Predating the seminal Saucier v. Hayes Dairy Products, Inc. case, an attorney retained on contingency, discharged by the client without cause, and replaced by different counsel was entitled to the full benefit of the contract with the client. United Gas Public Service Co. v. Christian, 186 La. 689, 173 So. 174, 176 (1937); D'Avricourt v. Seeger, 169 La. 620, 125 So. 735, 737 (1929). On original hearing in Saucier, this court followed this time-honored precedent thereby safeguarding the contractual contingent fee for discharged counsel in a without cause dismissal.[11] This led to two significant and undesirable results in the attorney-client contingent fee relationship: (1) restriction of the client's right to choose counsel by forcing payment of two contingency fees; and (2) awarding terminated counsel full contractual benefits for less than full and entire performance, which a contingency arrangement necessarily contemplates. Therefore, on rehearing this court formulated a new rule for apportioning fees between counsel discharged without cause and successor counsel.
With regard to remuneration of attorneys discharged for just cause before Saucier, both the Third and Fourth Circuits addressed the issue in the contingency fee context. Smith v. Westside Transit Lines, Inc., 313 So.2d 371 (La.App. 4th Cir.), writ denied, 318 So.2d 43 (La.1975); Guilbeau v. Fireman's Fund Insurance Co., 293 So.2d 216 (La.App. 3d Cir.1974). Both circuits agreed that attorneys dismissed for good cause were relegated to a quantum meruit recovery, and were not entitled to their full contractual contingency fee as allowed under the D'Avricourt-United Gas line of cases concerning without cause dismissals. Although permitting only quantum meruit recovery for counsel discharged for cause, the Smith panel observed that the method "encompasses far more than simply the hours spent by the attorney...." Smith, 313 So.2d at 378. Observing that an hourly calculation could lead to absurd results in contingency fee situations, the court held that discharged counsel's fee should be fixed based upon a percentage of the maximum he or she could have recovered in the case. The court reasoned:
In making that evaluation and allocation the trial judge should not confine his inquiry to the number of hours spent but should carefully evaluate the quality of the work performed and the effect that each attorney's work had on the ultimate settlement of the case.
Id. Even in formulating a rule more palpable for the client, as contrasted with the discharge without cause situation, the Smith panel recognized the client could still be cast with fees disproportionate to the settlement amount. Id.
To summarize the pre-Saucier status of apportioning fees among discharged and successive counsel, clients were liable for two contractual contingency fees in dismissals without cause. In dismissals with just cause, clients remunerated discharged counsel on a quantum meruit basis, with the successor attorney receiving the benefit of his or her contingency fee contract. As is readily apparent, this dichotomy exposed the client to liability beyond that for which he or she initially contracted.

Saucier v. Hayes Dairy Products, Inc. and its Progeny

In the landmark case of Saucier v. Hayes Dairy Products, Inc., a client discharged his *702 attorney without cause and subsequently employed a second attorney who brought the case to settlement. Saucier, 373 So.2d at 104 (original hearing). On original hearing, this court affirmed the judgment which gave both discharged and subsequent counsel the full benefit of their respective contingency fee contracts. On rehearing, after considering the nature and social utility of the contingency fee contract, we concluded that only one contingency fee should be paid by the client. Id. at 118. For the court, Justice Calogero explained:
[T]he amount of the fee [is] to be determined according to the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed. Further, that fee should in turn be allocated between or among the various attorneys involved in handling the claim in question, such fee apportionment to be on the basis of factors which are set forth in the Code of Professional Responsibility.
Id.[12] This court expressly denounced quantum meruit as a method of compensating an attorney retained under a contingency fee contract and subsequently dismissed without cause. We stressed:
The amount prescribed in the contingency fee contract, not quantum meruit, is the proper frame of reference for fixing compensation for the attorney prematurely discharged without cause.

Id. (emphasis added).
The process of applying the Saucier factors while considering the record evidence has been adopted by subsequent courts and unartfully termed quantum meruit. See, e.g., Hebert v. State Farm Insurance Co., 588 So.2d 1150 (La.App. 1st Cir.1991); Sims v. Selvage, 499 So.2d 325 (La.App. 1st Cir.1986), writ not considered, 503 So.2d 7 (La.1987); Fowler v. Jordan, 430 So.2d 711 (La.App. 2d Cir.1983). Presumably, a reason for the confusion in terminology among lower courts is that the Saucier factors are, to a degree, the same factors used in making a quantum meruit award in the pre-Saucier era. Michael A. Patterson & A. Edward Hardin, Discharged Counsel: The Dilemma Solved?, 28 La. B.J. 177, 181 & n. 24 (1981). Nevertheless, and regardless of semantics, Saucier departed from the established rule of creating liability in the client for more than one contingency fee in the situation of discharge without cause. Such clients are no longer liable for more than one contingency fee, but only the highest ethical contingency fee agreed to, apportioned according to the Saucier factors.[13]
Discharged counsel in this case argues that Saucier removed the distinction with regard to dismissals with or without cause. Discharged counsel's position is that the stipulated amount of fees at stake in this case, which were based upon the highest ethical contingency contracted for by George O'Rourke, should be apportioned under Saucier. We disagree. In light of Saucier, however, we must revisit the quantum meruit approach taken by Louisiana courts prior to Saucier in instances of dismissal with cause.

II.

DISCUSSION
The trial court determined that Belsome was discharged by George O'Rourke *703 for just cause. Ascertaining whether termination was with or without cause is a factual determination and will only be disturbed on appeal upon a finding of manifest error.[14]Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). Our review of the record in its entirety shows that the trial court's finding of dismissal for cause was not clearly wrong or manifestly erroneous, and the trial court's conclusion with regard to cause was reasonable.
The trial court found Belsome was uncommunicative with his client. The record supports this finding, revealing that Mr. O'Rourke was extremely concerned about the lack of communication between he and Belsome. O'Rourke testified that Belsome seldom communicated with him about the case's progress, and that O'Rourke was not even aware of certain key aspects of the litigation. In addition, the trial court found, and the record supports, that Belsome often was unsure strategically and substantively of what the case required, which uncertainty contributed to a general lack of confidence in Belsome by the client. The client's confidence was further eroded by an unprofessional social demeanor exhibited by Belsome, which led the client to question the prudence of continuing with Belsome as his attorney. After a thorough review of the record, we cannot say that the trial court was manifestly erroneous in finding Belsome was discharged for just cause.
The trial court also found Belsome had worked approximately two hundred hours on the case before discharge. After reviewing the record, we find no manifest error in this finding. We note both discharged and successor counsel testified their practices did not require time records be kept. However, we find the lower courts reasonably concluded that Belsome's reconstructed time records represented superfluous amounts when considering witness credibility with regard to time actually worked.
Where we disagree with both lower courts' determinations is in the application of the findings of cause and actual hours worked to the law of apportionment of fees between discharged and subsequent counsel in this contingent fee context. Saucier did not alter the rule that counsel discharged for cause are to be compensated on a quantum meruit basis. In the situation of counsel dismissed for cause by the client in the contingency fee context, quantum meruit cannot be limited merely to an hourly rate calculation. As the Fourth Circuit observed in Smith, quantum meruit involves "more than simply the hours spent.... It involves the ultimate results obtained as well as the particular benefit to the case derived for each unit of time devoted to the case." Smith, 313 So.2d at 378. A calculation based on hours alone is a bright-line rule which fails to consider the unique character of the contingency fee contract, including risks not encountered in hourly or fixed fee agreements, which Louisiana courts have recognized for many years. Therefore, we find that the lower courts erred in confining the quantum meruit analysis only to the actual hours spent by discharged counsel in this case.
In light of Saucier's rule which seeks to limit clients' exposure to no more than one contingency fee in cases of discharge without cause, we believe it is appropriate to give guidance to lower courts and litigants in cases of discharge with cause in the contingency fee context. For even in cases of discharge with cause, clients can still be exposed to liability exceeding one contingency fee under the Smith quantum meruit approach. Smith, 313 So.2d at 378. The reason for this is that the attorney discharged with cause receives a quantum meruit recovery and subsequent counsel enjoys the full benefit of his or her contingency contract with the client. This leads to the absurd result of exposing a client to nothing more than one contingency fee in cases of dismissal without cause, and to possibly more than one *704 contingency fee in cases of dismissal with cause.
We therefore hold that in cases of discharge with cause of an attorney retained on contingency, the trial court should determine the amount of the fee according to the Saucier rule, calculating the highest ethical contingency to which the client contractually agreed in any of the contingency fee contracts executed. The court should then allocate the fee between or among discharged and subsequent counsel based upon the Saucier factors. Thereafter, the court should consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel otherwise would receive after the Saucier allocation.
This rule serves to confine client exposure to no more than one contingency fee in both with and without cause situations. Furthermore, it allows courts to properly analyze the intricacies which invariably arise in contingency fee litigation, while also taking into consideration the conduct of attorneys which mar the profession and client confidence by requiring dismissal for cause.
In this case, the lower courts and litigants compiled an adequate record which enables this court to make a proper judgment without the necessity of a remand. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). Having agreed with the lower courts' findings with respect to cause and the actual hours spent by Belsome in this litigation, we move to the modified quantum meruit analysis articulated above.
Given the Saucier factors, we find particularly helpful the factors concerning the experience and skill of the lawyer, the results obtained, and the novelty and difficulty of the questions involved. Facts which benefit Belsome include the successful ruling of the medical review panel and the lifting of the bankruptcy stay. The results obtained in those areas were commendable. However, based on a review of the record, this was not a difficult case considering the severity of the malpractice involved, especially with regard to excessive prescription of pain medication. Furthermore, the record reflects that a less than adequate record was compiled before the medical review panel, although a favorable result was obtained. In addition, Belsome succeeded in lifting the bankruptcy stay with the aid of another lawyer, which motion was granted because the defendants did not oppose it. O'Rourke v. Cairns, 129 B.R. 87, 88 n. 1 (E.D.La.1991). Therefore, even considering key aspects which, Belsome argues, reflect why the lower courts' award was incorrect, we find he did less than the lion's share of the work in achieving the final settlement. Thus, under a Saucier analysis, we find Belsome's contribution to be no more than forty percent.
Next, we analyze the nature and gravity of the reasons for which the client discharged Belsome. The central reason for the client's discharge can be best characterized as nonfeasance. O'Rourke definitively testified that Belsome made little effort in communicating with him regarding the pending litigation, even as to major aspects such as lifting the bankruptcy stay. This non-communicative manner, in conjunction with the numerous occasions in which Belsome conveyed to the client that he was unsure how to proceed with the case, led the client to lose faith in Belsome. Additionally, discharged counsel's social demeanor affected the client such that it made it undesirable for O'Rourke to proceed with the representation. However, it is noteworthy that the client's claim was in no way prejudiced from a strategic or substantive point of view. Given these facts, with lack of communication chiefly among them, we find the nature and gravity of the cause leading to discharge warrants that discharged counsel's forty percent share of the stipulated fees at issue be reduced by twenty-five percent.
In summary of these findings, we hold that Belsome's share of the $206,000 worth of fees at stake be increased from the $25,000 awarded in the lower courts to $82,400, representing a forty percent allocation under the Saucier rule. However, we reduce this portion in the amount of twenty-five percent as a result of Belsome's dismissal for just cause; therefore, Belsome's total award shall be $61,800. The remainder of the disputed amount of fees shall revert to subsequent *705 counsel, taking into account any fees already disbursed.[15]

CONCLUSION
For these reasons, the judgment of the court of appeal apportioning the attorney fee award is amended as follows. The amount awarded to the intervenor shall be increased from $25,000 to $61,800, and the amount awarded to subsequent counsel shall be reduced from $181,000 to $144,200. The disputed amount is to be disbursed forthwith from the registry of the court and divided in accordance with this opinion.
AFFIRMED AS AMENDED.
CALOGERO, C.J., concurs and assigns reasons.
BLEICH, J., concurs.
VICTORY, J., dissents and assigns reasons.
JOHNSON, J., recused.
CALOGERO, Chief Justice, concurring.
I agree with the majority opinion's ultimate conclusion that Belsome's fee should be reduced because he was dismissed with cause, and I further agree that $61,800 is fair compensation. My only disagreement is at what stage this fee reduction occurs. I disagree with the majority's approach of reducing the fee after the Saucier analysis has been completed because this approach allows the successor attorney of an attorney discharged with cause seemingly to receive a "windfall" where he performed work no differently than if his predecessor had been dismissed without cause. This also violates the basic tenet that an attorney must "earn" his fee because the successor attorney did not "earn" the portion of the first attorney's fee that was reduced and is now credited to the successor attorney. Further, the majority's approach results in a redundant reduction because the district judge should consider the nature of the attorney's dismissal in performing the Saucier analysis.
We affirmed several important principles in Saucier; namely, an attorney's fee cannot be excessive, a client is only liable for one fee even if there are two or more attorneys involved, and a client is only liable to pay the highest ethical contingency fee for which the parties have contracted. This one fee is to be apportioned between the first and successor attorneys under the Saucier factors.
Both lawyers, the first fired with cause and the successor attorney, are entitled to share the highest ethical contingency fee that has been earned. In this case, in determining what each attorney has earned (what percentage of the highest permissible contingency fee contract signed by the client), the gross fee would first be determined. Then, in apportioning such fee, the district court should apply the factors set forth in the Rules of Professional Conduct as explained in Saucier, taking into account the fact that the first attorney was discharged with cause. Factor 5 of Rule 1.5(a) of the Rules of Professional Conduct is "the nature and length of the professional relationship with the client". This factor inherently includes a consideration of the relationship between the client and attorney, including how the relationship terminated. When considering the "nature" of the relationship, the district court will be considering many of the same exact factors it considers in determining whether dismissal with cause was justified, e.g., history of communications between client and attorney, client's satisfaction with attorney's efforts, the reasons underlying the attorney's dismissal, etc. In apportioning the contingency fee between the two attorneys when applying this factor, the district court would award the first attorney a percentage commensurate with the fact that his relationship with his client terminated at client's request and that such dismissal was with cause. The district court would also consider that the successor attorney's good relationship with the client warranted a higher percentage than that afforded to the first attorney. Thus, in performing the Saucier analysis, the *706 district court is reducing the first attorney's fee to account for his justified dismissal.
VICTORY, Justice, dissenting.
At the trial on the intervention in this matter, the district court, after determining that Belsome had been discharged for cause, compensated him according to the actual hours worked on the case by using a reasonable hourly rate. The court of appeal affirmed the finding of dismissal for cause and the method of compensation. The majority, however, rejects this approach, opting instead for a modified Saucier/quantum meruit determination with a novel "reduction" based upon the magnitude of the reasons justifying the dismissal for cause.
A Saucier/quantum meruit approach is proper for an attorney discharged without cause because his efforts to perform and his contributions to the recovery of the fee should be taken into consideration. However, in my view an attorney discharged for cause should be relegated to a reasonable hourly rate for the time spent on the case. The majority's approach overlooks the fact that if one breaches a contract, he generally should not be allowed to enforce or reap the benefits of the contract.
Here, based on a reasonable hourly rate, Belsome would have recovered $62,500 if the trial court had believed his testimony that he spent 500 hours on the case. Yet, the trial judge specifically rejected his testimony on credibility grounds, finding instead that he only worked 200 hours. The majority finds no error in the trial court's determination of only 200 hours being spent, but allows a recovery of $61,800 by enforcing, to a degree, the contingency contract between O'Rourke and Belsome, which Belsome failed to perform.
Specifically, the majority opinion allows recovery based on the largest contingency fee between O'Rourke and either Belsome or Fenaci. In my view, the majority should not establish a rule in a discharge for cause case that contemplates using the fee agreed to in the unperformed contract.[1] Further, the majority provides a recovery using as a base fee $206,000. However, that fee was not recovered under the Belsome/O'Rourke contract which Belsome failed to perform. Clearly, Belsome's fee should not be based on Fenaci's performance and recovery.
At a time when unprofessionalism in the legal community seem to appear with increasing frequency, we should establish a rule that encourages ethical and professional behavior from attorneys and establishes a genuine deterrent to conduct that the majority agrees mars the profession and client confidence in the bar.
NOTES
[*] Lemmon, J., not on panel. Rule IV, Part 2, § 3.
[1] The panel's decision was handed down on December 6, 1988. However, Shannon O'Rourke discharged Belsome from further representing her interest in the pending claim on September 25, 1988.
[2] The record reflects that Belsome pursued lifting the stay with the help of separate counsel, whom Belsome paid $10,000 for the assistance.
[3] O'Rourke v. Cairns, 129 B.R. 87 (E.D.La.1991).
[4] Fenasci and Gardner confected a separate agreement to apportion any fees Fenasci should receive at the case's resolution. That apportionment is not at issue in this appeal.
[5] Costs incurred by Belsome are not at issue in this appeal. An amount representing costs was stipulated to before trial and disbursed.
[6] The district court made clear that this stipulation represented the total sum for which George O'Rourke was responsible in the medical malpractice litigation.
[7] The trial judge cited Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979) as support for the fact that George O'Rourke would "bear no further responsibility for any fees in excess of $208,000 [sic] in conjunction with O'Rourke versus Cairns ...."
[8] Belsome and subsequent counsel testified that they did not keep time records in the O'Rourke matter because their fee was contingent on recovery only. Therefore, Belsome reconstructed approximate time spent on certain tasks, mostly from memory.
[9] See also, e.g., Clay v. Ballard, 9 Rob. 308, 323 (La.1844) ("Nor do we see anything immoral, either in the offer, or the acceptance of such extra compensation, in case of success."); Martinez v. Succession of Vives, 32 La. Ann. 305, 308 (1880) (finding the contract of an attorney with his client to receive a contingent fee of ten percent on the amount received is a valid contract).
[10] See also Buck & Beauchamp v. Blair & Buck, 36 La. Ann. 16, 21 (1884) ("We ... have no hesitation in recognizing the binding effect and validity of such contracts, without which many unfortunate litigants would be deprived of the only means of enforcing their rights.").
[11] The dissent on original hearing explained the judgment effectively divided the client's $75,000 personal injury recovery as follows:

Saucier$25,000
Saucier's first lawyer$25,000
Saucier's second lawyer$25,000
Saucier, 373 So.2d at 108 (Dennis, J., dissenting on original hearing). Both attorneys' contracts contemplated 33 1/3% fees contingent on recovery. See Saucier, 373 So.2d at 104 (original hearing).
[12] In Saucier, this court was referring to Disciplinary Rule 2-106 of the Code of Professional Responsibility. DR 2-106 is currently Rule 1.5 of the Rules of Professional Conduct. Rule 1.5(a) provides in part:

(1) The time and labor involved, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) Whether the fee is fixed or contingent.
[13] As used herein, the "Saucier factors" are those articulated in Rules of Professional Conduct, see supra note 12, which are similar to factors rooted in Louisiana case law for decades. Patterson & Hardin, supra, at 181 & n. 24.
[14] While we prefer a case-by-case approach in reviewing findings of discharge for cause, we agree with the Fourth Circuit panel in Smith v. Westside Transit Lines, Inc. that the attorney-client relationship is a close personal relationship which is far more complex than simply whether the attorney is performing his professional duties in the proper manner. Smith, 313 So.2d at 376.
[15] The record reflects the trial court, in allocating $181,000 in fees to subsequent counsel, actually ordered them to receive $79,000 after the intervention trial, taking into account prior amounts disbursed.
[1] For example, had O'Rourke agreed to a 40% contingency contract with Belsome and a 30% contingency contract with Fenaci, the majority's approach would allow the enforcement of the 40% contingency contract, despite the fact that Belsome failed to perform the contract.