699 So.2d 492 (1997)
Thomas J. OSBORNE, Jr., et al.
v.
VULCAN FOUNDRY, INC., et al.
No. 96-CA-1849.
Court of Appeal of Louisiana, Fourth Circuit.
September 3, 1997.
*493 S. Michael Cashio, Kenner, for Intervenor/Appellant.
Bradford R. Roberts, II, Roberts, Katz & Baudier, New Orleans, for Plaintiff/Appellee.
ARMSTRONG, Judge.
This appeal concerns the apportionment of a contingency fee between two attorneys who represented the same plaintiff at separate times. The plaintiff-intervenor, S. Michael Cashio, appeals from a judgment awarding him $75,000.00, plus interest, from a $324,000.00 contingency fee, and defendant-in-intervention, Robert J. Caluda, $248,000.00, plus interest.[1] For the following reasons, we now amend the judgment of the trial court to increase the proportion of the fee awarded to Cashio.
S. Michael Cashio was retained by Thomas J. Osborne Jr. in late 1986 to prosecute a personal injury claim for damages incurred as a result of an October 1986 on-the-job injury. In January 1994 Osborne discharged Cashio and retained Robert J. Caluda. Cashio intervened in the personal injury action to protect his interest. Caluda settled the suit in June 1995 for $810,000.00, generating the $324,000.00 contingency fee. Following trial of the intervention, the trial court found that Osborne had discharged Cashio for "cause" and that the work Cashio had performed only entitled him to a $75,000.00 share of the fee. On appeal, Cashio claims the trial court erred in finding that he had been discharged for cause and in finding that his seven-plus years of work on the case only entitled him to 23% of the contingency fee.
In Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1978), the Louisiana Supreme Court held that in a case involving two attorneys with separate contingency fee contracts with the client, one attorney having been discharged (without "cause") and the subsequent attorney having brought the case to judgment or settlement, the contingency fee is to be apportioned according to the services performed by each attorney. The proportionate services are to be determined according to factors contained in Rule 1.5(a) of the Rules of Professional Conduct.[2] Rule 1.5(a) provides:
(a) A lawyer's fee shall be reasonable. The factors to be considered in determining *494 the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) Whether the fee is fixed or contingent.
A trial court's apportionment of a contingency fee according to these factors is a factual determination and as such may not be disturbed absent manifest error. Stobart v. State, Through DOTD, 617 So.2d 880 (La. 1993).
In O'Rourke v. Cairns, 95-3054 (La.11/25/96), 683 So.2d 697, the Louisiana Supreme Court applied it's holding in Saucier to cases involving an attorney who has been discharged for cause. Once that attorney's proportionate share for services rendered has been determined according to Saucier, "the court should consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel otherwise would receive after the Saucier allocation." 95-3054 at 10-11, 683 So.2d at 704.
In the instant case, judgment apportioning the contingency fee was rendered seven months prior to O'Rourke being decided. However, it appears the trial court took into consideration Cashio's discharge for cause in determining his allocation of the contingency fee. The court did not make a finding as to the value of Cashio's services and then deduct a percentage for the discharge for cause, rather, it simply made one determination as to Cashio's deserved share of the contingency fee. O'Rourke will be applied retroactively to this case. See generally, Succession of Clivens, 426 So.2d 585 (La.1982) (new case law traditionally has prospective and retroactive effect).
Robert Caluda testified that as of the date of trial he had been practicing law for eighteen years, primarily representing plaintiffs in personal injury litigation. Caluda received Osborne's case in January 1994 and settled it in June 1995, with a final disbursement in August 1995. Cashio turned over Osborne's file to Caluda. At the time Caluda got the case Cashio had it set for trial in May 1994. Caluda obtained a continuance in March 1994 and trial had been set for June 1995 when the case settled. Caluda said the case was not ready for trial at the time he got the file. Caluda testified that he took the depositions of two liability witnesses and "developed" "roughly forty percent" of the witnesses. However, at one point, Caluda admitted that approximately two-thirds of the witnesses he listed on his witness list prepared for trial were names he got from Cashio's file. He also admitted that Cashio took "about" 92% of the depositions taken of liability witnesses. But, he stated that "a lot of [his] work product involve[d] collating and making sense of the hodge-podge of documents [Cashio] produced." Caluda said he had to obtain an expert witness to establish that the grate was a defective product; a gastroenterologist to establish Osborne's gastrointestinal problems (loss of control of his bowel and bladder); a psychologist to establish the psychological effects of Osborne's injuries and resulting complications on his life; and an economist to establish and project his future lost earnings. Caluda estimated that his obtaining the liability expert alone increased the chance of winning the liability issue at trial from 50% to 75-95%. However, Caluda indicated that this liability expert based his opinion on materials already obtained by Cashio, plus a video tape Caluda took of the scene and grounds after he got the case. Caluda said the medical records Cashio obtained from two hospitals were not certified and thus not suitable for admission *495 into evidence. Caluda settled the case through mediation for $810,000.00 and obtained a waiver of subrogation for approximately $300,000.00 in workers compensation benefits.
Thomas Buck, an attorney, represented two defendants, the Dock Board and Louisiana Insurance Guarantee Association. Buck testified that he had settlement discussions with Cashio but never reached an agreement. He said Cashio sent his firm a demand but that they never made any formal settlement offer to Cashio. Buck recalled Cashio setting a value on the case at $4.7 million and a settlement value of $2.3 million. He later said he valued the case at "anywhere between seven hundred, eight hundred and a million and a half, even two million," presumably settlement value. He said the additional experts retained by Caluda did not change his overall value of the case but said "it changed significantly my perception of plaintiff's ability to properly present its case." Buck said the biggest factor in reaching a settlement was that "plaintiff got down to what we thought was a reasonable number" and they paid it. Buck admitted that if Cashio had proposed a "reasonable" figure they would have paid it years ago. He said no firm settlement offers were actually made by his firm until mediation a month before trial. Buck said that at least one-half of the settlement was "substantially contributed to" by judgment interest and that most all of the judicial interest was earned while Cashio was counsel of record. Buck stated that he had marked his file "`Do not do anything in this'" because nothing had been done since Cashio set the May 1994 trial date in 1993.[3]
Thomas Usdin, an attorney, represented two defendants, New Orleans Marine Contractors and Baton Rouge Marine Contractors. Usdin testified that he had been handling the case for approximately three years as of the time of trial but was familiar with the file material compiled prior to 1994. He said the only fact witnesses deposed after Caluda got the case were the plaintiff and his wife, but that the experts retained by Caluda, the psychologist, urologist, gastroenterologist, metallurgist and economist, "added significant value to the case from our perspective." He said there were serious issues as to liability and damages prior to Caluda getting the case. Usdin also stated he did not recall any evidence concerning Osborne's gastrointestinal problems until Caluda brought in the gastroenterologist. He admitted that he had settled other cases where there were no economists, and that his firm had no economist assisting them in reaching a settlement agreement with Caluda. Usdin also admitted that Osborne had been earning approximately $50,000.00 per year before the accident and at the time Caluda had the case set for trial, there were almost nine years of past lost wages involved, amounting to $450,000.00, plus interestinterest which Thomas Buck had estimated to be from 80% to 100% of damages. Those past lost wages and interest alone equal or exceed the settlement amount. Usdin said he may have told Cashio they settled Osborne's case for what they felt was one-third of the judgment value.
S. Michael Cashio had been practicing law for twenty-five years at the time of trial. Caluda's counsel stipulated that Cashio was "a skilled attorney and had success in representing clients in the past." Cashio filed the initial lawsuit and supplemental petition on behalf of Osborne, and represented him from late 1986 through 1994. Cashio took the depositions of twenty-three fact witnesses all but one fact witnessand numerous medical witnesses, communicated with defendants, set the case for trial, etc. Caluda admitted Cashio took the depositions of "about" 92% of the "liability witnesses." Cashio took a videotape of the accident scene where, coincidentally, workers, apparently from the Dock Board, were replacing the grate which had collapsed and caused Osborne's heavy equipment to flip over. Caluda said there were some forty exhibits for admission into evidence at trial contained in the file he obtained from Cashio, although he said they were not organized or labeled. As previously mentioned, Caluda testified that *496 "much" of the material contained in his exhibits was material Cashio gave to him. But, Caluda also said the case was not ready for trial. Caluda said Cashio's file was "in a shambles" and was "[e]xtremely disorganized and extremely duplicitous." Cashio said all that was necessary was to update some witnesses. At the time Osborne discharged Cashio trial was some five months away. Cashio said the experts retained by Caluda were unnecessary. Cashio claimed an orthopedist treating the plaintiff had noted his gastrointestinal problemsproblems controlling his bladder and bowels. He also said he had written the same economist eventually retained by Caluda to inform him that he might require his services. However, Cashio felt he did not need an economist to prove lost income for the plaintiff. He had Osborne evaluated by a mental health professional a number of years before the May 1994 trial date. Cashio also felt he did not need a liability expert to testify the grate was defective. Cashio had set the case for trial several times and it had been continued several times. He had set the case for a mock trial but canceled it at the request of his client, Mr. Osborne. Cashio testified that the case was worth more than four million dollars in judgment and over two million to settle. He apparently had made an offer to a partner in Thomas Usdin's firm to settle the case for $1,508,190.00. That offer was rejected.
We find that S. Michael Cashio performed services in this case which played a significant part in the settlement of Osborne's case by Caluda. Robert Caluda also performed significant services which pushed this case toward settlement. However, we do note that, according to Thomas Buck, it may have been possible for Cashio to settle this case years earlier for the sum eventually settled for by Caluda; Cashio claims Caluda settled for less than the value of the case. While Caluda engineered the settlement and obtained a waiver of subrogation for the $300,000.00 in worker's compensation paid to Osborne, Cashio testified that it had long been his position that this amount was not owed. Osborne complained about Cashio and eventually discharged him, but not for almost seven years, and for a particular reasonhe did not want Cashio to represent both he and his wife. While Osborne did not like everything Cashio did, overall, this is not indicative of too strained a relationship between attorney and client.
The trial court found Cashio had been dismissed for cause. That finding is a finding of fact which may not be disturbed absent manifest error. O'Rourke v. Cairns, supra; Stobart v. State, Through DOTD, supra. Osborne testified he dismissed Cashio because he continued to represent both Osborne and his estranged wife in the personal injury suit despite Osborne's request that he cease representing his wife. Osborne also claimed Cashio was unprofessional, citing Cashio's meeting and interviewing him "in a roast beef place," and mentioned that he thought Cashio was unprepared at a deposition. However, the only reason Osborne claimed he fired Cashio was because he did not want Cashio representing both him and his wife.
Cashio testified that he felt there was no conflict in representing both Osborne and his wife because the wife's loss of consortium claim was dependent on Osborne's claim. Rule 1.7 of the Rules of Professional Conduct sets forth the general rule regarding conflicts of interest and provides:
Loyalty is an essential element in the lawyer's relationship to a client. Therefore:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(2) Each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless;
(1) The lawyer reasonably believes the representation will not be adversely affected; and

*497 (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
In the instant case, Osborne claims that after the accident his wife told him she was in love with another man. She filed suit for divorce while their suit for his personal injuries and her loss of consortium was pending. The couple was not divorced until after Cashio was discharged. Osborne testified that, while he was depressed on and off because of his injuries, his marital breakup drove him into "a pretty major depression, almost to the point of [a] nervous breakdown." Osborne asked Cashio how he could represent both he and his wife, in what he characterized as "a pretty vicious divorce," and he said Cashio replied, "Don't worry about it, I can handle it." Osborne stated he felt uncomfortable with that situation and later broached the subject again, querying Cashio on how he could represent both parties. Cashio reiterated that he could "handle it." Osborne confirmed that he had questions about Cashio's trustworthiness because Cashio insisted on continuing to represent both he and his wife in the suit.
It is true that the wife's claim for loss of consortium was interconnected with Osborne's suit and her recovery was largely dependent upon Osborne's successful recovery; the parties' interests were not adverse to each other. Therefore, under the facts of this case, we are not prepared to say that Rule 1.7 was violated by Cashio's continued representation of both Osborne and his wife in the personal injury suit. Nevertheless, a finding of discharge for cause does not depend upon a finding that the Rules of Professional Conduct were violated. See O'Rourke v. Cairns, supra. This is not the case of a client unschooled in law trying to direct his attorney in the prosecution of his case. This is a case of an attorney causing his client, already under a great deal of stress, additional and unnecessary stress. Under the circumstances presented in this case, we cannot say the trial court was manifestly erroneous in finding that Thomas Osborne had just cause to discharge Cashio. However, we believe Cashio's recovery should be diminished by no more than ten percent as a result of his being discharged for cause.
Considering all of the evidence in light of the Saucier factors, and applying a ten percent reduction for Cashio's discharge for cause, we find that the trial court was manifestly erroneous in finding that the services performed by S. Michael Cashio entitled him to only $75,000.00, plus interest, from a $323,000.00 contingency fee. We believe the evidence supports an even split of the fee for the services provided by each attorney$161,500.00 to each attorney. Cashio's portion of the fee will be reduced by ten percent, from $161,500.00 to $145,350.00. Following the direction of the Louisiana Supreme Court in O'Rourke, the ten percent discharge-for-cause "penalty" goes to Caluda, in addition to the $161,500.00 we award him for his services rendered.
For the foregoing reasons, we amend the judgment of the trial court to award plaintiff-intervenor S. Michael Cashio $145,350.00 plus interest; we further amend the judgment of the trial court to award Robert J. Caluda $177,650.00 plus interest. We affirm the judgment as amended.
AMENDED; AFFIRMED AS AMENDED.
MURRAY, J., concurs in the result.
NOTES
[1] By agreement of the two attorneys, $1,000.00 of the fee was given to a third attorney who had performed services for the personal injury plaintiff.
[2] Rule 1.5 is the embodiment of former Disciplinary Rule 2-106 of the Code of Professional Responsibility.
[3] While Buck mentioned waiting for the case to be considered abandoned, we note that would require five years of inactivity. La.C.C.P. art. 561. The case was not close to being subject to dismissal for abandonment.