STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

JAMES DAVIS

VERSUS

ZURICH AMERICAN INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20187129
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Sylvia R. Cooks, Chief Judge, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**AFFIRMED AS AMENDED.**

**Archie P. Joseph**
**Law Offices of Archie P. Joseph**
**Post Office Box 1283**
**707 Berard Street**
**Breaux Bridge, LA 70517**
**(337) 332-5287**
**COUNSEL FOR INTERVENOR/APPELLANT:**
    Archie P. Joseph

**Patrick C. Grace**
**Comeaux, Stephens & Grace**
**3900 North Causeway Boulevard, Suite1060**
**Metairie, LA 70002**
**(337) 551-6294**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Southwest Louisiana ElectricMembership Corp.**
    **Zurich American Insurance Company**
    **Boyd Vincent**

**G. Shelly Maturin II**
**Galloway Jefcoat, L.L.P.**
**Post Office Box 61550**
**1925 Dulles Drive**
**Lafayette, LA 70596**
**(337) 984-8020**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **James Davis**

**GREMILLION, Judge.**

The former attorney of the plaintiff, intervenor/appellant, Archie P. Joseph, appeals the trial court's award of $5,000.00 for work performed in plaintiff's tort claim following a motor vehicle accident that occurred during the course and scope of his employment. For the following reasons, we affirm as amended and increase Joseph's attorney fee award to $20,000.00, award judicial interest from the date of judicial demand, and award all costs of this appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, James Davis, was injured on December 1, 2017, while traveling as a guest passenger in a vehicle owned by his employer while en route to his employer's job site. Boyd Vincent, an employee of Southwest Louisiana Electric Membership Corporation (SLEMCO), was in the course and scope of his employment when the vehicle he was operating struck the vehicle occupied by Davis. Davis retained Joseph on December 14, 2017, to represent him in the workers' compensation claim and tort claim. The retainer agreement provided for a contingency fee of 33.33% if settled without suit and 40% if suit was filed.

Joseph filed a 1008 Disputed Claim for Compensation in June 2018. He also filed a 1009 Disputed Claim for Medical Services in July 2018. Davis terminated Joseph on September 6, 2018. Davis retained the services of Edward Taulbee, however, several weeks later, Davis terminated Taulbee and returned to Joseph requesting his services. Joseph declined. Davis, thereafter, retained the services of Shelly Maturin of Galloway & Jefcoat. Joseph emailed Maturin on September 12, 2018, advising that there were less than three months before Davis's tort claim would prescribe. Maturin filed a tort suit on November 27, 2018, naming Zurich, SLEMCO's insurer, as a defendant.

Joseph filed his intervention in the tort suit on January 24, 2019, seeking an award based on his contingency fee contract or quantum meruit. In November 2019, Maturin filed a motion to determine attorney fees urging that Joseph "performed a great deal of work on the comp case, but none on the tort case (suit had not been filed in the tort case, and prescription was quickly approaching)." Maturin stated that he sat for Davis's deposition, issued discovery, attended mediation, and eventually settled the workers' compensation case. Joseph was to be reimbursed for all of his expenses and the attorney fee was split 50/50. The workers' compensation claim was settled for $13,500.00. Joseph received 50% of the 20% attorney fees, amounting to $1,350.00. Joseph received $9,381.49 from the workers' compensation settlement for medical bills he paid on Davis's behalf. The March 25, 2019 order further deferred outstanding medical bills and invoices to Davis's personal injury tort claim/suit.

Maturin further stated that he sat for Davis's deposition, engaged in discovery and negotiated a settlement for Davis in the tort suit. Joseph filed an opposition to the motion to determine attorney fees. Davis's tort claim settled for $170,000.00. Following a January 2020 hearing on the motion to determine attorney fees, the trial court awarded Joseph $5,000.00 "for work performed in the tort suit, in addition to $241.19 in expenses." It dismissed Joseph's intervention.

Joseph now appeals and assigns as error:

I. The trial court judge abused his discretion when he awarded intervenor attorney fees in the amount of $5,000.00 which was excessively low in accordance with quantum meruit for services provided prior to his termination.

II. The trial court judge abused his discretion by not awarding judicial interest on the amount awarded "from the date of judicial demand until paid."

III. The trial court judge abused his discretion by not awarding Intervenor's court cost incurred in the filing and defending of his petition for intervention.

## DISCUSSION

*ATTORNEY FEES*

**Standard of Review**

A trial court has great discretion in setting an award of attorney fees and we will not disturb it in the absence of abuse. *Covington v. McNeese State Univ.*, 12-2182 (La. 5/7/13), 118 So.3d 343. "Where the standard of review is an abuse of discretion, the role of the reviewing court is not to determine what it considers to be an appropriate award, but rather it is to review the exercise of discretion by the trier of fact. *See Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 5 (La. 4/4/08), 979 So.2d 456, 459." *Id.* at 351. A trial court's factual findings are subject to the manifest error standard of review. *Stobart v. State, Dep't of Transp. And Dev.*, 617 So.2d 880 (La.1993).

The trial court provided little in the way of reasoning for its award of $5,000.00 other than to state at the hearing:

> TRIAL COURT: You know my problem, Mr. Joseph, is that you were working on the worker's comp, along with the tort claim. And from what I'm hearing, you wrote two letters to the tortfeasor, and that's the extent of the record that's available.
>
> . . . .
>
> JOSEPH: Your Honor, anybody that does personal injury cases knows that, once you sign up the clients, ninety percent of the time, you don't speak to the insurance company during that period. I mean, your client is treating with the doctor. I'm monitoring his medical treatment. I'm speaking to the doctors. I'm setting up his appointments, all this other stuff. I mean, plaintiff's attorneys don't talk to insurance companies, except once a month. He [Maturin] knows that, and he does plaintiff's work. You send your representation [letter] and you get phone calls from the adjusters during the time ---

TRIAL COURT: Yeah, but you're looking at getting compensation for work that came later. And what I'm hearing is that there are only two letter[s] that were written to the tortfeasor. The majority of the work was done on the worker's comp side –

JOSEPH: But the majority of the work was done on the tort claim, Your Honor. When I set the claim up, it was in reference to the tort claim. It wasn't for the worker's comp. I mean, the worker comp was incidental. I mean, I can't – ethically, I have to work under worker's comp and not the tort claim at the same time. I mean, then next thing you know, I have a malpractice suit against me, if I don't do my client right.

TRIAL COURT: All right. I'm going to award Mr. Joseph $5000 in attorney fees, okay.

Clearly, the trial court found that some of the work Joseph completed in the workers' compensation case was the foundation for the settlement of the tort suit. However, we find that the trial court's determination of $5,000.00 as the fee owed Joseph relating to the tort claim to be excessively low and an abuse of its discretion. The trial court did not provide any explanation as to what method of calculation it used in arriving at its $5,000.00 award for Joseph. We have no doubt that Joseph did not accept this case for the fee generated by the workers' compensation claim. Further, we find his testimony regarding the normal progression of the case regarding medical treatment and contact with the insurance company to be persuasive. Had Joseph completed the tort suit pursuant to his contingency fee contract terms, based on the settlement amount of $170,000.00 obtained by Maturin, Joseph would have been due $56,666.00. Thus, we must determine what would have been a reasonable fee under the facts and circumstances of this case.

We note that, although Joseph was initially discharged by Davis, he quickly returned to Joseph after a brief period of representation by Taulbee. Joseph, however, declined to represent Davis. Thus, whatever reason Davis had for discharging Joseph in the first place can only be presumed to have not been for cause. Of course, we are mindful that Joseph would have retained his entire fee had he resumed

4

representation of Davis as requested. Joseph argues in brief that he should be reimbursed based on his contingency fee contract, or alternatively in quantum meruit, while Maturin argues that any reimbursement must be based on quantum meruit.

Not only do the briefs of the parties present conflicting law regarding the proper method of reimbursement, so does the jurisprudence.[1] Thus, we will undertake a brief review of the law on determining the method of reimbursement to be used in cases where more than one attorney has been discharged (with and without cause) and another retained.[2] The seminal case regarding the award of attorney fees is *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102 (La.1978), in which it was made clear that in a case where an attorney has been discharged without cause, the contingency fee contract would be the basis for determining the fee rather than quantum meruit. *Saucier* directs us to the Rules of Professional Conduct, Rule 1.5, for the factors to be considered in determining the reasonableness of a fee:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;

---

[1] In brief, Maturin states, "Unless discharged for cause, an attorney who has been dismissed by his client is entitled to be reimbursed for his services on a quantum meruit basis, regardless of whether the attorney was initially retained under a contingency, set fee or hourly retainer," relying on several pre-*Saucier* cases including *Chiasson v. Law Firm of Dragonn & Kellner*, 335 So.2d 87(La.App. 3 Cir. 1976) and *Guilbeau v. Fireman's Fund Ins. Co.*, 293 So.2d 216 (La.App. 3 Cir. 1974).

[2] *See also Tran v. Williams*, 10-1030 (La.App. 3 Cir. 2/9/11), 56 So.3d 1224, where a panel of this court addressed the correct fee determination method.

5

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

On rehearing, the supreme court stated:

The amount prescribed in the contingency fee contract, not quantum meruit, is the proper frame of reference for fixing compensation for the attorney prematurely discharged without cause. We choose to vindicate the contingency fee contract rather than render it nugatory. In this way the client is prevented from reaping any possible unfair advantage resulting from the discharge of his attorney.

*Id.* at 118. The method for determining how that fee should be apportioned was also set forth:

[W]e conclude that only one contingency fee should be paid by the client, the amount of the fee to be determined according to the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed. Further, that fee should in turn be allocated between or among the various attorneys involved in handling the claim in question, such fee apportionment to be on the basis of factors which are set forth in the Code of Professional Responsibility.

*Id.*

Just a year later, in *Scott v. Kemper Ins. Co.*, 377 So.2d 66 (La.1979), the discharged attorney argued that the subsequent settlement entered into by his former client and her new attorney was void. The supreme court remanded the case to the trial court to determine the amount of the fee to which he was entitled. The court specifically stated though,

that proof should be made in accordance with our opinion in *Saucier v. Hayes*, *supra*, and not simply on a quantum meruit basis. *Saucier* directed a method of calculation whereby the trial judge would determine first what was the highest of the contingency fee percentages contracted for by the client, and he would then divide that fee appropriately among the attorneys. *Saucier* stated "This solution envisions apportionment of only the highest agreed upon contingent fee in accordance with factors set forth in the Code of Professional Responsibility. Thus, the fee is to be apportioned according to the

6

respective services and contributions of the attorneys for work performed and other relevant factors."

*Id*. at 70-71.

Fifteen years later, in *O'Rourke v. Cairns*, 95-3054 (La. 11/25/96), 683 So.2d 697, the supreme court addressed the fee to be an awarded an attorney who was discharged for cause. The attorney in *O'Rourke* had the same contingency fee arrangement as Joseph did with Davis. The court again denounced the use of quantum meruit as a method for determining the fee:

> This court expressly denounced *quantum meruit* as a method of compensating an attorney retained under a contingency fee contract and subsequently dismissed without cause. We stressed:
>
>> The amount prescribed in the contingency fee contract, *not quantum meruit*, is the proper frame of reference for fixing compensation for the attorney prematurely discharged *without cause*.
>
>> *Id*. (emphasis added).
>
> The process of applying the *Saucier* factors while considering the record evidence has been adopted by subsequent courts and unartfully termed *quantum meruit*. See, e.g., *Hebert v. State Farm Insurance Co*., 588 So.2d 1150 (La.App. 1st Cir.1991); *Sims v. Selvage*, 499 So.2d 325 (La.App. 1st Cir.1986), *writ not considered*, 503 So.2d 7 (La.1987); *Fowler v. Jordan*, 430 So.2d 711 (La.App. 2d Cir.1983). Presumably, a reason for the confusion in terminology among lower courts is that the *Saucier* factors are, to a degree, the same factors used in making a *quantum meruit* award in the pre-Saucier era. Michael A. Patterson & A. Edward Hardin, *Discharged Counsel: The Dilemma Solved?*, 28 La. B.J. 177, 181 & n. 24 (1981). Nevertheless, and regardless of semantics, *Saucier* departed from the established rule of creating liability in the client for more than one contingency fee in the situation of discharge without cause. Such clients are no longer liable for more than one contingency fee, *but only the highest ethical contingency fee agreed to, apportioned according to the Saucier factors*.

*Id*. at 702 (emphasis added).

However, in *O'Rourke*, the supreme court clarified the distinction between dismissal with or without cause in the fee sense, stating that the determination is

7

factual and will only be disturbed in the event of manifest error. *Id.* The supreme court stated:

> *Saucier* did not alter the rule that counsel discharged for cause are to be compensated on a *quantum meruit* basis. In the situation of counsel dismissed for cause by the client in the contingency fee context, *quantum meruit* cannot be limited merely to an hourly rate calculation. As the Fourth Circuit observed in Smith, *quantum meruit* involves "more than simply the hours spent. . . . It involves the ultimate results obtained as well as the particular benefit to the case derived for each unit of time devoted to the case." *Smith*, 313 So.2d at 378. A calculation based on hours alone is a bright-line rule which fails to consider the unique character of the contingency fee contract, including risks not encountered in hourly or fixed fee agreements, which Louisiana courts have recognized for many years. Therefore, we find that the lower courts erred in confining the *quantum meruit* analysis only to the actual hours spent by discharged counsel in this case.
>
> . . . .
>
> We therefore hold that in cases of discharge with cause of an attorney retained on contingency, the trial court should determine the amount of the fee according to the *Saucier* rule, calculating the highest ethical contingency to which the client contractually agreed in any of the contingency fee contracts executed. The court should then allocate the fee between or among discharged and subsequent counsel based upon the *Saucier* factors. Thereafter, the court should consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel otherwise would receive after the *Saucier* allocation.

*Id.* at 703-04. Thus, after finding that there was adequate information in the record to determine an appropriate fee, the court "move[d] to the modified *quantum meruit* analysis articulated above." *Id.*

Based on this jurisprudence, we must consider whether Joseph was discharged for cause and what is the appropriate vehicle for determining the amount due Joseph: the fee set forth in the contingency fee contract Joseph confected with Davis or quantum meruit.

***Dismissal With or Without Cause/Contingency Fee Contract***

The trial court did not make any express determinations regarding whether Joseph's dismissal was for cause. There is no evidence in the record regarding

8

Davis's initial dismissal of Joseph. In brief, Joseph states his dismissal was unjustified, but provides no further details. However, as noted above, the reason must not have been very significant since Davis quickly returned to Joseph for representation, even though Joseph declined. Moreover, there is no formal evidence in the record of the fee arrangement that Maturin entered into with Davis. In brief Joseph states, "Defendant (SLEMCO) issued settlement payment of the tort claim and the disputed attorney's fees in the amount of Fifty Six Thousand Six Hundred and Sixty-Six ($56,666.00) Dollars in addition to any outstanding medical expenses were withheld and placed in Galloway & Jeffcoat's Escrow Client Trust Account pending disbursement."[3] Nevertheless, we cannot manufacture evidence where none exists and are, therefore, precluded from using the *Saucier* method of selecting the highest reasonable contingency fee contract and apportioning accordingly when a dismissal is without cause. *See Tran v. Williams*, 56 So.3d 1224. Based on the record before us, we will instead rely on quantum meruit to determine an appropriate fee owed to Joseph.

*Fee determination*

Because the foundational work completed by Joseph was the basis of the tort suit, we find the trial court abused its discretion in awarding Joseph only $5,000.00 in attorney fees. Joseph, who had been an attorney for more than thirty years at the time of the hearing, spent nearly eight months representing Davis from December 2017 through his September 6, 2018 dismissal. He arranged all of the significant medical treatment, including surgery, that was undoubtedly the foundation of the tort suit. He spent a significant amount of time on this case as set forth in his documented records over the course of his representation. In the nine-page itemized

---

[3] Based on the amount noted in Joseph's brief, Maturin presumably entered into a contingency fee contract with the same terms as the one Joseph had with Davis because $56,666.00 is 33 1/3 percent of $170,000.00

list of time expended on the file, Joseph documented 93 hours of work on Davis's case.

In the period of time that Maturin represented Davis, amounting to almost seven months, he took Davis's deposition and settled the workers'

compensation claim in October 2018, and the tort suit in April 2019. Maturin filed suit on November 27, 2018 and deposed Davis on April 9, 2019. The case was settled in April 2019. We find it very unlikely that the deposition alone would have resulted in a $170,000.00 settlement in Davis's favor. Without the preliminary groundwork that was set forth by Joseph, this result simply would not have happened. Accordingly, based on all of the facts and circumstances of this case including the detailed billable hours spent on the file, and the factors set forth in the rules of professional conduct, we find Joseph is entitled to $20,000.00 in attorney fees.

*Legal Interest*

In this assignment of error, Joseph argues that he is entitled to judicial interest from the date of judicial demand. He cites two workers' compensation cases for the proposition that interest automatically attaches until the judgment is satisfied. Pursuant to La.Code Civ.P. art. 1921, "The court shall award interest in the judgment as prayed for or as provided by law." Joseph specifically pled for judicial interest, and we award judicial interest from the date of judicial demand.

*Court Costs*

In this assignment of error, Joseph requests $1,391.00 in court costs comprised of $300.00 for the filing fee of the Petition for Intervention, $338.00 for the filing of the suspensive appeal, $678.00 for the filing of the records for the suspensive appeal, and $75.00 for the court reporter fees for the suspensive appeal. The trial court's April 3, 2020 judgment ordered each party to bear their own costs. The trial court may render judgment for costs, or any part thereof, as it may consider

10

equitable, and its assessment of costs will not be reversed on appeal in the absence of an abuse of discretion. La.Code Civ.P. art. 1920; *Glencoe Educ. Foundation, Inc. v. Clerk of Court and Recorder of Mortgages for Parish of St. Mary*, 10-1872 (La.App. 1 Cir. 5/6/11), 65 So.3d 225, *writ denied*, 11-1142 (La. 10/21/11), 73 So.3d 383. We decline to award these court costs as Joseph is partially to blame for incurring them for failing to follow through with the representation of Davis. However, we will award Joseph all costs associated with this appeal.

## CONCLUSION

The judgment of the trial court awarding the intervenor-appellant, Archie P. Joseph, $5,0000.00 in attorney fees is amended for a total attorney fee award of $20,000.00 with judicial interest accruing from the date of judicial demand. Joseph is further awarded all costs of this appeal.

**AFFIRMED AS AMENDED**.

11